## LOTTIE I. DAY, Admx., *vs.* BOSTON AND MAINE RAILROAD.

### York.   Opinion June 11, 1903.

*Verdict.   Practice.   Trial.   Contributory Negligence.*
*Stat. 1891, c. 124.*

The court is not bound to submit a case to the jury, but may direct a verdict for the defendant, when all the inferences which a jury may justifiably draw from the testimony are insufficient to support a verdict so that it would be the duty of the court to set aside such a verdict, if it had been rendered.

A new trial having been granted on general motion, the case was heard a second time before the jury, and the presiding justice at the close of the evidence directed a verdict for the defendant.

*Held;* that the conclusion announced in the former opinion was justified and required by the established principles of law applied to the facts there stated, and that the evidence with the additional testimony before the court does not warrant a different result.

*Also;* that the inference from all the testimony considered in the light of the undisputed situations, is almost irresistible that the plaintiff's intestate did either see, or hear, the approaching train but over-estimating its distance or miscalculating its speed, with an absence of caution which is incomprehensible, inconsiderately and rashly undertook to cross the track in front of the train instead of waiting for it to pass. If so, the consequences of such mistake and temerity cannot be cast upon the defendant. No railroad company can be held for a failure of experiments of that kind; and if one chooses in such a position to take risks, he must bear the consequences of failure.

If the positions most favorable to the plaintiff be assumed to be correct, the accident cannot be attributed wholly to the negligence of the defendant, if the plaintiff's intestate after discovering the train might have avoided the fatal consequences by the exercise of reasonable and ordinary vigilance and caution on his own part. In such a case the negligence of the injured party is deemed a proximate cause which contributes to the injury and bars his right to recover.

*Day* v. *B. & M. Railroad*, 96 Maine, 207, sustained.

Exceptions by plaintiff.   Overruled.

Upon a second trial of this case granted by the court, as reported in 96 Maine, 207, the presiding justice ordered a verdict for the defendant.

The parties agreed that if a verdict in favor of the plaintiff would have been authorized by the evidence, judgment should be rendered for the plaintiff for such sum as the law court believe the plaintiff was entitled to.

The case is stated in the opinion.

*E. P. Spinney*, for plaintiff.

*G. C. Yeaton*, for defendant.

SITTING:   EMERY, WHITEHOUSE, STROUT, SAVAGE, SPEAR, JJ.

WHITEHOUSE, J.   This action is founded on the statute of 1891 giving a right of action for injuries causing death, and is brought against the defendant company to recover damages for negligently causing the death of the plaintiff's intestate, Edwin Day, at the Junkins railroad crossing in North Berwick on the 21st day of July, 1899.   The former trial of the action at the September term of court, 1900, resulted in a verdict of $4,000 in favor of the plaintiff. This verdict was set aside by the law court for reasons clearly and sufficiently stated in the opinion of the court, 96 Maine, 207.   The cause came on for trial a second time at the September term of court, 1902, and after the evidence had been introduced for both the plaintiff and the defendant, the presiding judge directed the jury to return a verdict for the defendant.   The case comes to this court a second time on the plaintiff's exceptions to this ruling, with a stipulation that "if a verdict in favor of the plaintiff would have been authorized by the evidence, judgment shall be rendered for the plaintiff for such sum as the law court believes the plaintiff is entitled to."

After a careful examination of the evidence disclosed by the record now presented, it is the opinion of the court that the conclusion announced in the former opinion was justified and required by the established principles of law applied to the facts there stated, and that the evidence with additional testimony now before the court will not warrant a different result.

The leading and most essential facts involved in the decision of the vital issue in the case do not appear to be in controversy.   In the forenoon of July 21, 1899, a "bright and clear day," the plaintiff's

intestate, Edwin Day, a man thirty-five years of age, with faculties and senses unimpaired, was driving a single horse attached to an unloaded hay-cart along Wells Street from North Berwick towards the grade crossing above named which intersects the Eastern division of the defendant's railway at an angle of $43\frac{1}{2}$ degrees. He was leaning against the front rail of the hay-rack, one rein in each hand, and driving at the moderate pace of about five miles an hour. When within about "thirty or forty" feet of the crossing he stopped his team for "two or three seconds" and then urging his horse into a trot attempted to drive over the defendant's railroad crossing, but was struck and immediately killed by a special train from Boston to Portland approaching from a direction thus partially in his rear.

The railroad crossing in question was 1832 feet from North Berwick railroad station, and the track of the Eastern division is on a descending grade and nearly straight for a distance of about six miles towards Kennebunk. It was admitted that this crossing was not provided with gates, flagman or automatic signals, and it may be assumed, though it was not conceded by the defendant, that it was "near the compact part of the town." It was not in controversy that at the time of the accident the special train was running "at a greater speed than six miles an hour," the plaintiff contending that it was from 50 to 60 miles an hour, and the defendant conceding that it was from 20 to 25 miles an hour. Whether or not the bell was rung and the whistle blown on this train as required by law, was one of the controverted questions in the case. The plaintiff's evidence, which was necessarily to a great extent of a negative character, tended to show that these statutory signals of the approach of the train were not given, while the defendant's evidence and the weight of all the positive testimony in the case, showed that these customary warnings were duly sounded. But assuming that there was sufficient evidence to support a finding of the jury in favor of the plaintiff's contention respecting the speed of the train and the signals of approach, the defendant invokes the settled rule of law that no such omission of duty or violation of statute on the part of the defendant would relieve the traveler from the obligation to use his own senses of sight and hearing to inform himself of an approaching

train, and confidently insists that the plaintiff's intestate either failed to exercise the requisite degree of care and vigilance to discover the train at the time in question, or, discovering it, rashly attempted to cross in front of it.

The distance on Wells Street from its junction with Portland Street to the crossing is 471 feet, and the defendant contended and introduced photographs with other evidence to show that at every point in this distance of 471 feet on Wells Street, some portion of the train or smoke-stack, or the smoke and steam rising from it, must have been plainly visible to the traveler throughout the entire distance of 911 feet on the railroad as the train approached from Drew's overhead bridge to the crossing. The plaintiff contends, however, that through a large portion of this distance the traveler's view of the train was obstructed by a high embankment on the northerly side of the railroad, and also by a tight board snow-fence 27 feet from the center of the track, and that it was impossible for Mr. Day, standing on his hay-rack at any point on Wells Street between the crossing and a point 75 feet distant therefrom, to see the approaching train until it came within 253 feet of the crossing. But it could not reasonably be contended that no possible means were available to the traveler for the discovery of an approaching train in season to avoid a collision, and the existence of extraordinary difficulties in discovering it by sight should have suggested to a person of ordinary care and prudence the necessity of exercising greater precaution and making stronger efforts to ascertain the facts in some other way. It is common knowledge that a vast increase in the speed of railroad trains has been required in recent years in order to meet a constant demand for the most rapid transit consistent with the safety of public travel, and ordinary care and prudence accordingly demand of the traveler upon our highways greater vigilance and more thoughtful attention in order to discover the approach of railroad trains and avoid collisions on the crossings at grade.

In the case at bar it has been seen that Mr. Day was driving on Wells Street at the rate of about five miles an hour, and according

to an average of the estimates of the distance made by the plaintiff's witnesses, he stopped at a point about thirty-two feet from the crossing and just outside of the line of the snow-fence twenty-seven feet from the center of the track. It is not in controversy, as already noted, that at any point on Wells Street within 75 feet from the crossing, some portion of the train must have been visible to Mr. Day after it approached within 253 feet of the crossing; and at a distance of 27 feet from the center of the track, being inside of the line of the snow-fence, there was an unobstructed view of the whole train.

After stopping "two or three seconds," Mr. Day "hurried his horse right up into a trot" towards the crossing; and it is a reasonable inference that this "hurried trot" was not less than five miles an hour, or seven feet per second, the speed at which he was "jogging along" before he stopped. The plaintiff's evidence tended to show that the train was running at a speed of at least 50 miles an hour, or 73 feet per second. If so, it traversed the entire distance of 253 feet in three and one-half seconds, and the whole train must have been within the limit of 253 feet and in plain view of Mr. Day before he had advanced to a point within 15 feet of the track. Under the circumstances thus disclosed by the plaintiff's own evidence, it is inconceivable that if Mr. Day had been vigilant and alert and exercised the circumspection of a careful and prudent man, he could have failed to see some indication of an approaching train, or, if he had listened attentively, that he could have failed to hear some signal or sound of an approaching train, before he reached the point of dangerous proximity to the railroad track.

In the former opinion in this case (96 Maine, 213) it is said: "There is no evidence that in approaching the railroad crossing Mr. Day took any precaution whatever to ascertain whether a train was also then approaching the crossing from either direction. True, he stopped momentarily some twenty feet from the crossing, but it does not appear that he looked or listened or took any other measures to ascertain what might be approaching on the railroad tracks. There is no evidence for what purpose he stopped there." But the record now before the court, with the additional evidence presented

at the second trial of the case, tends to modify this view and to strengthen the probability of the alternative suggested at the close of the opinion that "being aware of the approaching train, he recklessly undertook to cross before it." James B. Walker was not a witness at the former trial, but testified at the second hearing that as he was approaching the crossing from the opposite side he saw Mr. Bragdon and Mr. Day pass each other, and in regard to the conduct of Mr. Day, says: "Mr. Day hauled up and stopped and looked around, and then he came right along, he took his reins and started his horse right into a trot. . . . He stopped two or three seconds; he turned his head and looked up the track towards the bridge. After he started the horse, he was looking ahead and crosswise and he put the whip right on his horse; he took his reins and urged his horse up and drove right on to the crossing. He was looking to the right, up towards the depot." This is corroborated by Mr. Bragdon, a witness at both trials, and also by the fireman, a witness for the defendant, who observed the movements of Mr. Day from the engine and assumed that he would not attempt to cross in front of the train. He says: "When he approached the crossing he was looking up the track, and he drove up and stopped, looking towards us coming down the track. . . . When he hit the horse I hollered 'Whoa.' I thought Mr. Day was going to stop; instead of that, after he drove up there, he thought he had time to go ahead, and so I hollered to the engineer, when I saw he was going to drive ahead, to stop."

The inference from all this testimony considered in the light of the undisputed situations, is almost irresistible that Mr. Day did either see, or hear, the approaching train but over-estimating its distance or miscalculating its speed, with an absence of caution which is incomprehensible, inconsiderately and rashly undertook to cross the track in front of the train instead of waiting for it to pass. If so, "the consequences of such mistake and temerity cannot be cast upon the defendant. No railroad company can be held for a failure of experiments of that kind; and if one chooses in such a position to take risks, he must bear the consequences of failure." *Chicago, Rock Island and Pacific R. R. Co.* v. *Houston,* 95 U. S.,

697; *Smith* v. *Me. Cent. Railroad Co.*, 87 Maine, 351. When a railroad track crosses or is crossed by a highway, the traveler with a team and the railroad company have concurrent rights and obligations with respect to the use of the way at the place of intersection. It is not ordinarily reasonable or practicable for a train to stop and give precedence to a team approaching on the highway. It cannot be required to do so except in cases of manifest danger when it is apparent that a collision could not be otherwise avoided. It is the duty of the traveler on the highway to wait for the train. The train has the preference and the right of way. *Continental Improvement Co.* v. *Stead*, 95 U. S. 161; 2 Wood on Railroads, 1510; Pierce on Railroads, 342; *Lesan* v. *M. C. R. R. Co.*, 77 Maine, 85.

On the other hand, the management of a railroad train must be conducted with due regard to all of the provisions of the statute designed to insure the safety of the traveler both upon the railroad and the highway. The train "is bound to give reasonable and timely warning of its approach to a crossing, but it cannot be reasonable and timely if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of a coming shot, but the velocity of the latter generally outstrips the warning. The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by wind and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing." *Continental Imp. Co.* v. *Stead*, 95 U. S. 161, supra. If, therefore, the special train in question was approaching a crossing near the compact part of the village at the great speed of 50 miles an hour without flagmen at the crossing and without giving the statutory warnings of its approach, the officers and servants in charge of it were guilty of gross and culpable recklessness which would justly have subjected them to the severest censure. But if these positions, most favorable to the plaintiff, be assumed to be correct, the accident cannot be attributed wholly to the negligence of the defendant if the plaintiff's intestate after discovering the train

might have avoided the fatal consequences by the exercise of reasonable and ordinary vigilance and caution on his own part. In such a case the negligence of the injured party is deemed a proximate cause which contributes to the injury and bars his right to recover. This principle has been so often enunciated in the recent decisions of this court that no further exposition of it is required at this time. *Atwood* v. *Bangor, O. & O. R. R. Co.,* 91 Maine, 399; *Conley* v. *Me. Cent. R. R. Co.,* 95 Maine, 149; *Ward* v. *Me. Cent. Railroad Co.,* 96 Maine, 137. See also *Schofield* v. *Chicago, Milwaukee & St. Paul R. R. Co.,* 114 U. S., 615, a case in which the court directed a verdict for the defendant, and one presenting striking analogies to the case at bar.

After a patient and critical examination of the case it is the opinion of the court that with all the inferences which the jury could justifiably have drawn from it, the evidence now presented is insufficient to support a verdict for the plaintiff, so that it would be the duty of the court to set aside such a verdict if it had been rendered. Under such circumstances it is the established rule of procedure in this State that the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. *Heath* v. *Jaquith,* 68 Maine, 433; *Jewell* v. *Gagne,* 82 Maine, 431; *Moore* v. *McKenney,* 83 Maine, 80, 23 Am. St. Rep. 753; *Market & Fulton Nat. Bank* v. *Sargent,* 85 Maine, 349, 35 Am. St. Rep. 376; *Bennett* v. *Talbot,* 90 Maine, 229; *Coleman* v. *Lord,* 96 Maine, 192. The mandate must therefore be,

                                   *Exceptions overruled.*